**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dennis MITCHELL, Defendant and Appellant.**

No. 17697.

Supreme Court of South Dakota.

Argued May 27, 1992.

Decided Sept. 16, 1992.

Mark Barnett, Att. Gen., Karen E. Cremer and Ronald D. Campbell, Asst. Attys. Gen., Pierre, for plaintiff and appellee.

Lee Schoenbeck, Webster, for defendant and appellant.

MILLER, Chief Justice.

Dennis Mitchell appeals his conviction on six counts of rape in the second-degree. We affirm.

### FACTS

In October, 1978, Mitchell married Geraldine. S.D. is Geraldine's 21–year–old daughter. At the time Dennis and Geraldine married, S.D. was eight years old. Initially, S.D. and her new stepfather had a good relationship. However, the relationship began to subtly change when S.D. became a teenager. At this time, Mitchell began telling S.D. that she should go on birth control pills. He told her that this was to prevent pregnancy when she started dating, as the boys she dated would expect her to have sex. Mitchell additionally informed S.D. that the doctor told him she would be unable to obtain birth control pills if she was still a virgin. Mitchell explained to S.D. that sex would be very painful for her if her hymen was not first broken. Mitchell volunteered to do this for S.D.

In 1984, when S.D. was thirteen years old, Mitchell inserted a butter knife into her vagina to break her hymen. Mitchell informed S.D. that this would never happen again. A few weeks later, Mitchell took S.D. to the family cabin at Big Stone Lake. Mitchell instructed S.D. to go into one of the bedrooms and take her clothes off. He told her she still would not be able to date because her vagina was not "stretched out" enough. Mitchell came into the bedroom and proceeded to have sexual intercourse with S.D. He said this would never happen again.

A few months later, S.D. and Mitchell went fishing on a pontoon boat while staying at the family lake cabin. Mitchell told

S.D. that a young man he worked with was interested in dating her. However, Mitchell said he did not feel that S.D. was experienced enough sexually to go out with this young man. Again, Mitchell volunteered to educate S.D. Mitchell directed the boat over to a secluded beach where he then had sexual intercourse with her. He told her this would never happen again.

In May, 1985, S.D. went on a trip with Mitchell and Scott Eccles to Milbank, South Dakota, where they were going to buy Eccles a car. Instead, they went to a bar in Twin Brooks, South Dakota, and drank beer all afternoon. (S.D. was fourteen at that time.) Later, Eccles and S.D. dropped Mitchell off at a bar in Summit, South Dakota, and they drove around, ending up out in the country where the car broke down. S.D. arrived home late that night and was grounded for a month. A few weeks later, Mitchell began to threaten S.D. with an indefinite grounding unless she agreed to have sex with him. Sometime thereafter, S.D. was working at the family restaurant when Mitchell sent her home. Mitchell followed her home a half hour later, sent her to her room, told her to undress, and then had sexual intercourse with her.

S.D. was again sexually accosted by her stepfather a few months later when they went gopher hunting. Mitchell told S.D. that he had been going to counseling and that his counselors thought it was best for him to have sex with S.D. one last time so that he could get it out of his system. After he had sexual intercourse with her, he told her it would never happen again.

The final rape occurred in May, 1986, at the family home. S.D. needed permission from her parents to attend a school science fair. Mitchell informed S.D. that if she had sex with him he would sign her permission slip. That night, S.D. met her stepfather in the living room while her mother and sister were sleeping. Mitchell had sexual intercourse with S.D. and she was allowed to go on the science trip.

In the fall of 1988, S.D. began college at the University of South Dakota. Two years later, in October, 1990, she told a counselor that she had been sexually abused by her stepfather. The counselor told S.D. that she, as a counselor, was required by law to report the sexual abuse to the police. Thereafter, S.D. gave the police department a written statement.

Mitchell was charged by complaint with six counts of second-degree rape (SDCL 22–22–1(5)).[1] After a preliminary hearing, Mitchell was bound over for trial. A Part II Information was filed charging Mitchell as an habitual offender under SDCL 22–7–7.[2] (It alleged that Mitchell had been convicted of felonies on two other occasions: for obtaining money and property under false pretenses and for making or uttering a check against a nonexistent account.)

The jury trial commenced August 7, 1991. A mistrial was declared after voir dire had begun because there were not enough potential jurors summoned. The second jury trial began September 4, 1991. Mitchell was found guilty of all six counts of rape in the second degree and he ap-

1. SDCL 22–22–1(5) provides:
   Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:
   ....
   (5) Where the victim is ten years of age, but less than sixteen years of age, and the perpetrator is at least three years older than the victim[.]
2. SDCL 22–7–7 provides:
   When a defendant has been convicted of one or two prior felonies under the laws of this state or any other state or the United States, in addition to the principal felony, the sentence for the principal felony shall be enhanced by changing the class of the principal felony to the next class which is more severe. The determination of whether a prior offense is a felony for purposes of this chapter shall be determined by whether it is a felony under the laws of this state or under the laws of the United States at the time of conviction of such prior offense. For the purpose of this section, if the principal felony is not classified it shall be enhanced to the class which has an equal maximum imprisonment. For the purposes of this section, if the maximum imprisonment for the principal felony falls between two classifications, the principal felony shall be enhanced to the class which has the less severe maximum authorized imprisonment.

peals, raising several issues which are addressed below.

## DECISION

### I.

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MITCHELL'S MOTION FOR MISTRIAL BASED UPON PROSECUTORIAL MISCONDUCT.

During the jury's deliberation, Mitchell made a motion for a mistrial based on prosecutorial misconduct. The motion was denied. Mitchell contends that his right to a fair trial was prejudiced by the prosecutorial misconduct which occurred in four separate areas:

(1) Reference to birth control in opening statement;

(2) Violation of the court's order limiting surrebuttal;

(3) Improper accreditation of a witness in the closing argument; and

(4) Improper reference to Mitchell in closing argument as a "con man."

Trial courts have considerable discretion in granting or denying a mistrial. *State v. Myers*, 464 N.W.2d 608, 609 (S.D.1990); *State v. Blalack*, 434 N.W.2d 55, 58 (S.D. 1988). This court will overturn the trial court's decision only when this discretion is clearly abused. *Id.; State v. Michalek*, 407 N.W.2d 815, 818 (S.D.1987); *State v. Farley*, 290 N.W.2d 491, 494 (S.D.1980). "To justify the granting of a mistrial, an actual showing of prejudice must exist." *Blalack*, 434 N.W.2d at 58; *State v. Closs*, 366 N.W.2d 138, 143 (S.D.1985). " 'Prejudicial error' for purposes of determining whether error constitutes grounds for mistrial is error 'which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it.' " *Myers*, 464 N.W.2d at 610 (quoting *Blalack*, 434 N.W.2d at 58); *State v. Wimberly*, 467 N.W.2d 499, 504 (S.D.1991); *State v. Younger*, 453 N.W.2d 834, 838 (S.D.1990); *Mi-*

*chalek*, 407 N.W.2d at 818); *State v. Dokken*, 385 N.W.2d 493, 498 (S.D.1986).

With these standards in mind, we turn to the claimed incidents of misconduct.

### A. *Birth Control*

■ S.D. testified at the preliminary hearing that she began taking birth control pills in April, 1985. She further testified that going on birth control pills was Mitchell's idea, although she was agreeable to the idea as she did not want Mitchell to get her pregnant. S.D. also testified that she was not sexually active at the time she began taking birth control pills.[3] Shortly after she began taking birth control pills, S.D. had sexual intercourse with a young man (not the same young man referred to in footnote 3).

Prior to trial, State filed a motion to suppress S.D.'s prior sexual conduct. In response, Mitchell filed a "rape-shield" motion asking that he be allowed to present evidence of two incidents of sexual conduct involving S.D. and other young men. State filed its resistance to Mitchell's "rape-shield" motion stating, among other reasons, that State did not intend to introduce testimony that S.D. was placed upon birth control pills, thus making the issue of whether the birth control prescription was obtained at Mitchell's insistence irrelevant. The trial court decided to reserve its ruling on State's motion to suppress the victim's prior sexual conduct until after S.D.'s trial testimony.

At a later motions hearing, State requested a ruling on its motion to suppress the victim's prior sexual conduct. At that time, Assistant Attorney General Ronald Campbell explained:

The only way that I could see this would ever become relevant is if the State would introduce evidence concerning her taking birth control pills and then it might become relevant as to whether she had—whether it was because [Mitchell] set it up or because she was having sex

---

3. In mid-summer of 1984, shortly after the rape on the beach, S.D. had sexual intercourse with the young man that Mitchell had been "prepar-

ing" her to have sex with. She testified that they had used a condom.

with someone, had had on one occasion sex with someone else. If the State does not bring this evidence in and at this time if the Court rules in favor of the State as far as suppression, it will not bring it in and it will not make it relevant. Or if at some time between now and the date of the trial, if the Court would rule, would make it much easier for the State to make its opening statement. It would make it much easier for the defense to know what he's going to be defending against. And the State would commit not to go into the birth control pills. For the obvious reason that he does not want to make this relevant. He does not want to put the victim through testifying about two incidents of sexual conduct with someone other than [Mitchell].

The trial court granted State's motion, ruling that the evidence of S.D.'s prior sexual conduct was of minimal or no relevance and that it would be highly prejudicial and, therefore, it would not allow any questions regarding other sexual activity.

In his opening statement, Assistant Attorney General Campbell, while setting forth what S.D. would testify to, stated:

Then this relationship [between Mitchell and S.D.] began to change. [Mitchell] began suggesting to her that she was getting to the age where she should start thinking about dating if she was going to date. *That she should go on birth control pills and that, in order to have a sexual relationship with these boys she dated—and it will sound—she can tell it to you much better, and that's the way it should be, than I can.* But this was brought up many, many times. As a matter of fact, [Mitchell] told her that he'd call the doctor. *And in order to be placed on these birth control pills it was necessary that a steel instrument be inserted inside of her and that this would really hurt unless someone did it ahead of time.* Be almost impossible to have this test being placed on birth control pills[.] (Emphasis added.)

During Mitchell's opening statement reference was made to birth control. State asked for a bench conference. The jury was briefly excused so that the trial court and counsel could clarify the ground rules regarding the birth control issue. State reiterated its position that it did not intend to present evidence about the birth control issue as it related to S.D.'s prior sexual conduct, but that it intended to present testimony that Mitchell used the gynecological examination as a means of getting S.D.'s permission to break her hymen with the butter knife. The trial court sustained State's objection.

State argues that there were two separate and distinct stories regarding the birth control pills. First, there was the testimony regarding the need for a gynecological examination for S.D. to obtain birth control pills. This testimony relates to Count I of the information.

The second type of testimony concerning birth control related to the period of time S.D. actually went on birth control pills. S.D. testified at the preliminary hearing that she was not sexually active when she went on the pill (except for Mitchell); however, she later engaged in sexual relations with a young man. This second type of testimony is the testimony which State sought to suppress.

Mitchell argues that State has made the distinction in the testimony by using hindsight. However, we believe the trial court's comments reflect that the distinction was clear throughout:

The statement about birth control is relevant, the original one, as a basis for the first penetration. The events of a year later which the State says it's not going to go into is a totally different—and as long as the State stays away from it the Court's ruling stands.

Based on the above testimony, we believe State's references to birth control were within the trial court's ruling on the issue and, therefore, the trial court did not abuse its discretion in denying the motion for mistrial. *Myers, supra; Blalack, supra.*

B. *Surrebuttal*

■ Although Mitchell did not testify during defense's case-in-chief, he called eight witnesses in his defense. One of

these witnesses was James Casstenens, Mitchell's former employer. During cross-examination, Casstenens was asked the reason Mitchell had quit his job. Casstenens replied that Mitchell stated he was dying from sclerosis of the liver. Later, during cross-examination of Mitchell as a surrebuttal witness, Assistant Attorney General Campbell asked Mitchell if he had sclerosis of the liver. Mitchell replied "no." Mitchell's counsel objected and the trial court struck the question and answer and instructed the jury to disregard the question and answer since it had nothing to do with S.D.'s rebuttal testimony.

We stated earlier that the prejudicial error must be error "which in all probability ... produced some effect upon the jury's verdict[.]" *Wimberly*, 467 N.W.2d at 504; *State v. Tapio*, 432 N.W.2d 268 (S.D.1988). While the question asked by State exceeded the bounds of surrebuttal, it did not rise to the level of prejudicial error and thus, did not warrant the granting of a mistrial.

### C. *Improper Accreditation of Witness*

■ Mitchell argues that because State successfully obtained pretrial rulings which prohibited references to S.D.'s prior sexual conduct, comments by State in closing argument improperly accredited S.D. thereby prejudicing Mitchell. Mitchell argues that the statements made by State were untrue and misled the jury. During closing argument, Assistant Attorney General Campbell said:

> You really think that those witnesses knew everything that was going on in that cafe every minute? What those witnesses really told you was that as much as we want you to not harm our father and our brother and our husband, *we do not know anything bad about [S.D.]* That's what those witnesses told you. *Because you may rest assured that if there was one scrap of dirt that they could have picked up, they would have used it.*

. . . .

> MR. CAMPBELL: *There was never one bad thing said about this girl by any of the defense's witnesses.* (Emphasis added.)

The fact that S.D. had sexual relations with young men other than Mitchell in no way reflects upon her credibility and veracity as a witness. In fact, references to her prior sexual conduct reflect on S.D.'s character, which is exactly the type of evidence that SDCL 23A–22–15 was designed to exclude. *See also State v. Blalack*, 434 N.W.2d 55 (S.D.1989).

In its argument to the jury, State is allowed to comment on the evidence. Perhaps in this case, State exceeded the scope of what is fair and proper argument; however, we do not believe this error reaches the magnitude of prejudicial error. We are convinced beyond a reasonable doubt that the jury would have returned a guilty verdict absent this error.

While "[t]he state's conduct in the present case is hardly in keeping with the prosecutor's 'overriding obligation, shared by the court, to see that defendant receives a fair trial, however guilty he may be[,]'" it did not amount to prosecutorial misconduct. *State v. Sahlie*, 245 N.W.2d 476, 479 (S.D.1976) (quoting *State v. Sha*, 292 Minn. 182, 193 N.W.2d 829, 831 (1972)). The trial court properly denied Mitchell's motion for mistrial.

### D. *Reference as "Con Man"*

■ Mitchell claims Assistant Attorney General Campbell improperly referred to him as a "con man" during State's closing argument. The argument complained of is as follows:

> And he had the audacity to tell her that he was going to counseling. And his counselor had recommended that he have sex with her one last time. Why? So they could have a normal father/daughter relationship. My God. How could any man—Do you think that that girl could sit up there and think up a lie as terrible as that? This is so cruel and so demeaning that no person in the world could think up a story—the truth is sometimes more outrageous, more damaging, more traumatic than any lie could ever be. *This man is a con man. The*

*evidence has shown you that. He's a manipulative man. And there are con men and manipulative men who, through pressure and fast talking, take money from old people or the mentally slow people or the greedy people. And that is bad.* (Emphasis added.)

After jury deliberations began, Mitchell made a motion for mistrial. Trial court denied the motion, stating that in the context in which the terminology "con man" was used, it was fair argument. We agree. In *State v. McDowell*, 391 N.W.2d 661, 666 (S.D.1986), this court stated:

> We note that ruling on a motion for mistrial is within the trial court's discretion, *State v. Disbrow*, 266 N.W.2d 246, 252 (S.D.1978); that an actual showing of prejudice must exist to justify the granting of a mistrial, *State v. High Elk*, 298 N.W.2d 87, 89 (S.D.1980); and that we will not disturb the trial court's ruling on a motion for mistrial unless we are convinced there was a clear abuse of discretion. *State v. Kidd*, 286 N.W.2d 120, 122 (S.D.1979).

Mitchell took advantage of S.D.'s trust in him and he convinced her that it was in her best interest for her to have sex with him. He told her that his counselor suggested that he have sex with her "one last time" to get it out of his system. S.D. was only thirteen years old when Mitchell began taking advantage of her trust in him. We agree with the trial court that, considering the context in which the reference was made, it was fair argument.

## II.

### WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MITCHELL'S MOTION FOR A NEW TRIAL FOR FAILURE TO FORMALLY ARRAIGN HIM.

Mitchell argues that he is entitled to a new trial because he was never formally arraigned on the information. Mitchell was charged by criminal complaint. Thereafter, he was arrested and made his first appearance. Mitchell was then given a court-appointed attorney. He later appeared before a law-trained magistrate who advised him of his constitutional and statutory rights.

Later, a Part I Information was filed charging Mitchell with the six counts of second-degree rape and a Part II Information (habitual criminal) was also filed. The next day, the trial court held a motions hearing. *After the hearing, Mitchell's counsel requested that the arraignment be delayed until a future omnibus hearing was to be held.* A formal arraignment was never held.

SDCL 23A–7–1 provides:

> An arraignment shall be conducted in open court, except that an arraignment for a Class 2 misdemeanor may be conducted in chambers, and shall consist of reading the indictment, information or complaint, as is applicable, to the defendant or stating to him the substance of the charge and calling on him to plead thereto.

> A defendant must be informed that if the name in the indictment, information or complaint is not his true name, he must then declare his true name or be proceeded against by the name given in the indictment, information or complaint. If he gives no other name, the court may proceed accordingly. If he alleges that another name is his true name, he shall be proceeded against pursuant to § 23A–6–20. He shall be given a copy of the indictment, information or complaint, as is applicable, before he is called upon to plead.

This court has stated that while the failure to arraign is a "gross oversight," it is not a per se constitutional violation. *State v. Winters*, 414 N.W.2d 1, 2 (S.D.1987). "Due process of law, this court has held, does not require the state to adopt any particular form of procedure, *so long as it appears that the accused has had sufficient notice of the accusation and an adequate opportunity to defend himself in the prosecution.*" *Id.* (quoting *Garland v. Washington*, 232 U.S. 642, 645, 34 S.Ct. 456, 457, 58 L.Ed. 772, 775 (1914)) (emphasis added).

We believe Mitchell had sufficient notice of the accusation and a sufficient opportunity to defend himself. In fact, Mitchell was advised of his constitutional and statutory rights by the magistrate judge. At various times during the prosecution, he was represented by three experienced criminal trial attorneys; he was advised of the maximum sentences he could receive; he was present with counsel at the preliminary hearing where State's witness was cross-examined by counsel; he was present with counsel at four motions hearings; he was given a speedy public trial by an impartial jury; at trial his counsel cross-examined State's witnesses, subpoenaed and called eight witnesses on his behalf and he chose to exercise his right to remain silent until surrebuttal, at which time he took the stand.

As the United States Supreme Court stated in *Garland:* "Tried by this test it cannot for a moment be maintained that the want of formal arraignment deprived the accused of any substantial right, or in any wise changed the course of trial to his disadvantage." 232 U.S. at 645, 34 S.Ct. at 457, 58 L.Ed. at 775 (quoted with approval in *Winters,* 414 N.W.2d at 2).

Likewise, from this record, it is clear that Mitchell was not deprived of any substantial right nor was he disadvantaged in any way.

### III.

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING STATE'S MOTION TO SUPPRESS THE VICTIM'S PRIOR SEXUAL CONDUCT.

■ Mitchell asserts that the "rape-shield" statute was used to deprive him of his constitutional right to confront and cross-examine S.D. regarding her prior sexual conduct. The facts relevant to this issue are as follows. Mitchell first had sexual contact with S.D. in April or May of 1984, when he inserted the butter knife into her vagina to break her hymen. A few weeks later, he raped her at the lake cabin. At this time, S.D. had not had sexual intercourse with anyone other than Mitchell.

In mid-summer, 1984, S.D. had sexual intercourse with the young man Mitchell had been "preparing" her to have sex with. S.D. was not taking birth control pills at this time; however, other protection was used to prevent pregnancy (condoms). In April, 1985, S.D. first started taking birth control pills. Shortly thereafter, S.D. had sexual intercourse with another young man.

State filed a motion to suppress this prior sexual conduct and Mitchell also filed a "rape-shield" motion. Mitchell sought to show by confronting and cross-examining S.D. that:

1. In the time periods alleged in Counts I (butter knife) and II (lake cabin), S.D. was in fact having a sexual relationship with the individual whose name is part of her story involving Mitchell, but that Mitchell was not a party to that sexual relationship.

2. S.D. lied under oath on at least one occasion about her motivation for going on the birth control pill, which relates to Count IV (sex to prevent indefinite grounding).

3. S.D. had a bias towards Mitchell for grounding her for inappropriate conduct involving an incident of sexual relationship with another person, which was the predicate to Count IV.

After hearing arguments on the motions, the trial court ruled that evidence of S.D.'s prior sexual conduct was of no relevance and would be highly prejudicial to her. The statutes provide:

> In prosecutions for rape, evidence of specific instances of a victim's prior sexual conduct shall not be admitted nor reference made thereto before the jury or jury panel, except as provided in this section. Whenever a party proposes to offer evidence concerning a victim's prior sexual conduct, the court shall first conduct a hearing in the absence of the jury and the public to consider and rule upon the relevancy and materiality of the evidence.

SDCL 23A–22–15. In *Blalack* we said:

> As a general rule, the admission of evidence concerning a rape victim's prior

sexual conduct is precluded by SDCL 23A–22–15. This statute, like rape-shield statutes in other jurisdictions, represents a legislative determination that in most instances, such evidence is not relevant and highly prejudicial to the victim. (Citations omitted.) In [ ] limited situations[,] ... evidence of a victim's previous sexual encounters [may be] relevant and material to a fact at issue in the case[. Under these circumstances] the determination of the admissibility of this evidence is entrusted to the sound discretion of the trial court to be exercised after an *in camera* hearing. (Citations omitted.)

*Blalack*, 434 N.W.2d at 57. This court will not interfere with this determination absent a clear abuse of discretion. *Id.; Sabag v. Continental South Dakota*, 374 N.W.2d 349, 354 (S.D.1985); *State v. McNamara*, 325 N.W.2d 288, 291 (S.D. 1982). "[A]n abuse of discretion 'refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" *State v. Lykken*, 484 N.W.2d 869, 874 (S.D.1992) (quoting *State v. Woodfork*, 454 N.W.2d 332, 335 (S.D. 1990)).

In the present case, we cannot find a clear demonstration of abuse of discretion. We fail to see how S.D.'s relationships with two other young men bear any relevance to whether Mitchell was guilty of statutory rape. Therefore, the trial court did not abuse its discretion in granting State's motion to suppress.

## IV.

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING MITCHELL'S MOTION TO DISMISS THE INFORMATION BECAUSE THE TRIAL JUDGE WAS NAMED AS A WITNESS ON THE PART II INFORMATION.

■ Mitchell argues that the informations should have been dismissed because the trial judge was named as a witness on the Part II Information. When State filed the Part II Information, it listed David Gilbertson as one of the witnesses because he was the state's attorney for Roberts County at the time Mitchell's probation was revoked on a previous criminal violation. Gilbertson was later appointed as circuit judge for the Fifth Circuit and presided at this trial. Mitchell filed a motion to strike for improper witness. The trial court ordered that his name be struck from the Information; however, it did not dismiss the Informations.

Mitchell contends that the trial judge's name on the witness list created an appearance of impropriety and warrants a new trial. We find this argument has no merit. State assured the trial court that it had no intention of calling him as a witness. Furthermore, SDCL 19–14–5 prohibits a judge presiding at a trial from testifying as a witness. Prior to sentencing, State dismissed the Part II Information due to its failure to properly arraign him. Certainly, the trial court acted properly by striking its name from the Information; there was no prejudice to Mitchell and no abuse of discretion. *Michalek, supra; Farley, supra.*

## V.

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT RESTRICTED MITCHELL'S SUR-REBUTTAL TESTIMONY TO THOSE ISSUES COVERED IN THE REBUTTAL TESTIMONY.

■ Mitchell contends that his right to testify in his own defense was improperly restricted by the trial court. State rested its case-in-chief after calling S.D., its only witness. Mitchell then presented his defense in which he called eight witnesses. Mitchell chose not to testify. Mitchell then rested his case. Thereafter, State recalled S.D. as its only rebuttal witness. State then rested its rebuttal case. Mitchell was then called to testify in surrebuttal.

At this point, State requested an *in camera* hearing where it requested that Mitchell's testimony be limited to those matters covered in rebuttal. Although the trial court granted State's motion, it agreed to Mitchell's request that he be allowed to

specifically deny Count I and generally deny the other counts.

Thereafter, Mitchell testified that he never pressured S.D. to have a sexual relationship with him. Mitchell specifically denied Counts I and II and he generally denied the other counts. Mitchell also testified that he was "not guilty" and that is why he did not plead guilty to the rape charges.

> As a general rule, a party has no right to reply to evidence given on rebuttal or to introduce evidence by way of surrebuttal, unless facts are introduced in the case for the first time on ... rebuttal. Where, under the circumstances, a party may be entitled to offer evidence in surrebuttal, he will be restricted to such evidence as will rebut the rebuttal evidence, or to the new matter introduced in rebuttal.... Moreover, surrebuttal evidence, properly so-called, is limited to refutation of the testimony of an opposing rebuttal witness, and does not spill over to include testimony directed at something other than disproving, or at least casting doubt on, what that witness has said; in other words, it is not a basis for a general attack on the overall conclusory inferences to be drawn from the opposing rebuttal witness' evidence.

71 A.L.R.Fed. 94, 96 (1985).

Furthermore, SDCL 23A–24–2(2), (3) and (4) provide:

> After a jury has been impaneled and sworn, a trial must proceed in the following order:
>
> ....
>
> (2) The prosecuting attorney or other counsel for the state must make an opening statement and offer the evidence in support of the indictment or information;
>
> (3) The defendant or his counsel may then open his defense and offer his evidence in support thereof. However, the defendant or his counsel may make his opening statement immediately after the prosecuting attorney's opening statement;
>
> (4) *The parties may then, respectively, offer rebutting evidence only, unless the court, for good reason, in furtherance of justice or to correct an evident oversight, permits them to offer evidence upon their original case[.]*

Mitchell's surrebuttal testimony was not improperly restricted by the trial court. In fact, it was Mitchell, who by failing to testify in his own case-in-chief, thereby limited his later testimony to those issues raised on rebuttal. (*See State v. Forsha*, 190 Mo. 296, 88 S.W. 746, 755 (1905)).

We have considered the other issues raised by Mitchell, including the denial of the request for a psychological evaluation of S.D., the denial of his motion to dismiss the information grounded upon vagueness, and the length of his sentence. We find these issues are controlled by settled law and are totally lacking in merit.

Affirmed.

WUEST, SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (specially concurring).

In specially concurring, it behooves me to express that the prosecutorial misconduct herein was beneath the dignity and office of the prosecutor. Further, that he exceeded the bounds of legitimate advocacy as expressed in the majority opinion. As to *why* the Circuit Judge, who was to preside in the trial, was named as a witness, I cannot comprehend. It represents a zenith in poor judgment and I certainly agree with the majority that the Circuit Judge's name was properly stricken. Further, in my opinion, the prosecutor deliberately violated a court order limiting surrebuttal testimony. See, *State v. Gage*, 302 N.W.2d 793, 797 (S.D.1981). There, the State's Attorney asked the age of a certain witness, in direct violation of the trial court's pre-trial order. We held that the prosecutor's direct violation of a court order was contemptible and inexcusable. We expressed:

> It is axiomatic to a fair trial that the state obey the court's orders concerning the conduct of the trial ... It is well to

keep in mind that a prosecutor's duty is not to simply convict but to do justice. Said quotation was approved in *State v. Kleinsasser*, 436 N.W.2d 279, 282 (S.D. 1989).

This is not a case where the state bolstered the credibility of the complaining witness by employing an expert testimony. Cf. *State v. Svihl*, 490 N.W.2d 269 (S.D. 1992) (Henderson, Justice, dissenting), and the litany of cases cited in said dissent forbidding evidence which this Court now approves. Rather, this case pivotally hinged on the veracity of the victim's testimony. A jury believed her. Her testimony was explicit, shocking, and overwhelmingly portrayed that Mitchell had committed atrocities upon her at divers times and places.

In viewing this type of prosecutorial misconduct, and overwhelmed by the horrid and perverse acts upon an innocent girl, how does one balance the weights of justice? In *State v. Tapio*, 432 N.W.2d 268, 271 (S.D.1988), we expounded on prosecutorial misconduct. Therein, we expressed that misconduct must be of such sufficient significance to result in the denial of a fair trial and that it had to produce an effect on the final result. I note, also, in the State's brief, in respect to the surrebuttal issue, that the State mentions "... the question asked by the state may have exceeded the bounds of surrebuttal." Clearly it did. But the question remains: With respect to the various acts (via statements) of the prosecutor, was there an effect on the final result? To that, I must answer, I seriously doubt it.

[N]o hard and fast rules exist which state with certainty when prosecutorial misconduct reaches a level of prejudicial error which demands reversal of the conviction and a new trial; each case must be decided on its own facts.

*State v. Webb*, 251 N.W.2d 687 (S.D.1977). Subsequently, this Court held that this Court had to be "... able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained." *State v. Heumiller*, 317 N.W.2d 126 (S.D.1982) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966)). Absent the prosecutorial misconduct, and it exists in several places in this record, it is clear to this writer, because of representations of the victim (not some hearsay evidence by a social worker or expert), that the jury would have returned a verdict of guilty. However, that does not excuse the professional conduct of this prosecutor. Characterized by "winning" at all costs, his conduct became perilously close to a reversal on the professional ethics question. One of the comments made by Mr. Campbell was that Mitchell would, impliedly, take money from old people or the slow people or the greedy people. Supposedly, this is permissible because he first describes "con-men" and that Mitchell is a "con-man." To leap from the first statement—to the second statement is an argument not based upon any fact in the evidence. It was improper argument. And with reference to the "con-men" conclusion, I strongly disagree with the majority opinion's description that "it was fair argument." Money, finances, schemes to defraud, cheating to obtain property were not subjects presented to this jury. This was a rape trial—not an intent to defraud trial.

## II.

Mitchell chose not to testify during the trial. However, he called eight defense witnesses. State made the decision to recall the victim to the stand. Her testimony was riveted on one purpose: To rebut the defense of Mitchell. Mitchell then chose to call himself to the stand as a surrebuttal witness. The prosecutor asked for a ruling to restrict Mitchell's testimony to the rebuttal testimony. When Mitchell, whose testimony was restricted and limited, was on the stand, the prosecutor asked Mitchell if he ever had "sclerosis of the liver?" This was absolutely beyond the scope of the examination of Mitchell and the prosecutor knew it. State had an abundance of evidence to convict Mitchell. This kind of question was calculated to influence the jury on a topic which was totally immaterial. Before us, during argument in the Supreme Court, the prosecutor admitted

that it was. How did the trial court limit the surrebuttal testimony of the defendant? This is a bone of legal contention in Mitchell's brief. The State recalled, as a rebuttal witness, the alleged rape victim. In response, the defense called the defendant, Dennis Mitchell, for surrebuttal. This was the first time the defendant testified during the trial. Upon request by the State, the trial court limited the scope of Mitchell's testimony. Mitchell would be allowed to testify on Count I because Count I was specifically addressed during rebuttal. Mitchell would not be allowed to testify on specific instances of Counts II–VI. However, he was permitted to be "general" on those counts; i.e., he was permitted to simply deny Counts II–VI. I note in the record that when the trial judge stated that general testimony on the Counts II–VI would be permissible, defense counsel replied, *"I have no interests in going into the specifics of any count."* (Emphasis supplied mine).

Let us review Mitchell's testimony. His testimony denied pressuring victim to have sex in 1983 and 1984, denied pressuring her to do anything, totally denied sexual relations with victim, stated he was not guilty on each count, and stated that he felt angry and hurt. It appears to this Justice that the trial judge bent over backwards, legally speaking, to permit Mitchell to actually go beyond the rebuttal testimony of the victim. I perceive the trial court was trying to be fair and that's the heart of justice, to be fair.

As I earlier stated, the State asked if Mitchell ever had sclerosis of the liver. Mitchell answered "no" and made a reference to the I–29 Lounge. Defense then argued that the State had left the scope of rebuttal and opened the door to testimony on the other counts. After the State responded, the court struck the question and answer and instructed the jury to disregard.

Yet, Mitchell characterized the limitations established by Judge Gilbertson as follows:

When I took the stand I didn't realize that I was gonna be told what I could say. That I was gonna be limited to saying I didn't do it. That's it. There is no defense for any of it. They gave dates, we proved 'em wrong. They change their testimony. And the rules were set by the Court said this part will be eliminated. This part will be eliminated. And it wasn't. They could step right outside, go on. Made no difference, I mean.

For posterity, I wish to express that it is a fundamental right afforded to an accused to testify. *Rock v. Arkansas*, 483 U.S. 44, 51–52, 107 S.Ct. 2704, 97 L.Ed.2d 37, 46 (1987). Our State Constitution, Article VI, Section 7, grants an accused a constitutional right to "defend in person." Here, Mitchell is advocating that a procedural rule was vaulted over a constitutional right. At first blush, that contention seemed true. However, the cold record informed me otherwise.

Therefore, I specially join the majority opinion believing that Mitchell's constitutional right to defend in person was not violated. Further, I chose to write a special concurrence because of the prosecutorial misconduct in this case. Perfection is rarely attained in dispensing justice by our courts. However, we strive for it. To seek perfection is the inherent nature of the process of judicial decision. Here, we did not have a perfect trial but we did have a fair trial. In *McDowell*, a celebrated murder trial in eastern South Dakota, cited in the majority opinion, I wrote: "It is not required that defendant receive a perfect trial, only that he receive a fair trial." *McDowell*, 391 N.W.2d at 666.